Wilkins, Appellant, *v.* McSorley et al.

Argued April 22, 1935.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Henry Kauffman,* for appellant, filed no brief.

*E. W. Langfitt,* with him *Elmer G. Klaber,* for appellees.

OPINION BY CUNNINGHAM, J., July 18, 1935:
William Wilkins, employed by John McSorley, one

of the defendants, as a brick mason and plasterer, died of pneumonia on April 29, 1931. Alleging that his death was attributable to an "accident" which occurred in the course of his employment on April 25th, his widow, Sadie Wilkins, appellant herein, claimed compensation for herself and three minor children under our Workmen's Compensation Act of June 2, 1915, P. L. 736, and its amendments.

After two hearings before the referee, her claim was disallowed, but the board, upon her appeal to it, substituted its own findings for those of the referee and awarded compensation. When the employer and his insurance carrier appealed to the common pleas the record was remitted to the board for more specific findings of fact upon a material element in the case; upon the return of the findings, the court below sustained the exceptions of the defendants, reversed the award by the board, and entered judgment in favor of the employer and insurance carrier; hence this appeal by the claimant.

In order that the scope of our review may be confined to the vital issue in the case, we assume that the evidence shows a causal connection between certain events which occurred in the course of the decedent's employment on the afternoon of April 25, 1931, and his death from pneumonia four days later. The controlling question, however, is whether any of those events was such an undesigned, sudden and unexpected event, or fortuitous happening, as to constitute an "accident" within the meaning of the statute.

The circumstances under which Wilkins was working, and the material incidents which occurred, that afternoon may be thus summarized. "At approximately 1:00 o'clock in the afternoon, [he] was engaged in closing two holes in a used fire box in the basement of the King Edward Apartments. He had been suffering with a fairly good cold for a period of one week. The

fire box was about 7 or 8 feet long, 3 feet wide, [and 6 feet high] with brick walls on all four sides about 18 inches thick. The fire had been drawn on April 23, 1931, two days before, and the box was still warm. Attached to the box was an electric fan, 18 inches in diameter, 120 blades, 7½ horse power, with one speed of 1750 revolutions per minute, sufficient to cause a pretty good draft, drawing in air from a conduit leading from the outside on a cold April day. The fan had been placed at the front end of the box and was torn out and installed in the back, and the decedent first bricked up the wall at the front and then bricked up around the fan. He was heavily dressed and was perspiring." (From board's third finding of fact.)

Before decedent had completed bricking in the fan, a fellow employee, the electrician in charge of such work, desired to test its operation in the new position. The test would necessarily create such a draft and stir up so much dust and soot as to render it dangerous for Wilkins to remain where he was then working.

Under circumstances to which we shall refer later, decedent, instead of coming out of the fire box, merely stuck his head out of the door. The wires were connected by the electrician and the fan operated long enough to check its revolutions—a period of from fifteen to thirty seconds—with the draft passing over decedent's body. After the test decedent returned to his work, finished bricking around the fan, and put the grates in. About the middle of the afternoon he became too ill to continue, went home, was seized with chills, and several days later was taken to a hospital.

In its fourth finding the board concluded that "the exposure of the decedent to the draft created by this fan, and the ingestion of the resulting dust and soot into the respiratory tract of the decedent thereafter, was the predisposing cause of the ensuing pneumonia;

and was a very material factor in the precipitation of this disease."

There was no medical testimony relative to the fact of the "ingestion of ...... dust and soot into the respiratory tract," or its effect, if present. From what we have already said about a causal connection, it is immaterial whether the pneumonia resulted from exposure to the draft alone or from a combination of both causes, as suggested by the board.

The branch of the case upon which the court below found the findings of the board not sufficiently specific to enable it to decide the question of law involved related to the circumstances under which decedent remained in the fire box during the testing of the fan.

It, accordingly, remitted the record for specific findings upon the important question, "whether or not there was warning and opportunity to avoid what took place."

In his original findings, the referee, upon this point, said:

"Before [the electrician] started the motor he called to the deceased and told him he was going to test the motor and for him to get out. The deceased replied that it was too hard work and that he would stick his head out the door. He accordingly did put his head out the door, the motor was started and run just long enough to determine whether it would work, which we think from the testimony, was not over 15 seconds when the motor was shut down."

Upon examination of the evidence, we find that statement supported by the following testimony of Charles E. Shelton, the electrician: . "I had the motor ready to turn over and I wanted to try the rotation of it and Mr. Wilkins was working in the boiler and I asked him to get out and he said it was too hard to get back in and he said he would stick his head out the door, which he did, and I flashed it on long enough to tell the rotation of the motor and stopped it and after that

I took the fuses out of the switch block and put it in my tool room which was a switch-board room."

In returning its findings to the common pleas, pursuant to the remission, the board said: "We have found that he did have warning, and of course, could have avoided the occurrence."

Counsel for claimant directs attention in his brief to the testimony of a witness to the effect that decedent protested after the fan had been started and the electrician said it would not hurt him. Neither the referee nor the board based any finding upon this testimony. As this witness also testified, contrary to the statements of all the other witnesses, that the fan was in operation for half an hour, his testimony was probably deemed to be lacking in accuracy and credibility. Even if true, his statement does not apply, in the light of the findings with respect to notice and warning, to a material matter.

It is argued on behalf of claimant that "the exposure [to the draft] was an unexpected, undesigned and fortuitous circumstance sufficient to support an award." No support can be found in the testimony for the assertion that the turning on of the fan, which brought about the exposure, was an undesigned, sudden or unexpected event—i. e. an accident. On the contrary, the evidence is that it was done designedly and with due notice and warning to decedent; there was nothing accidental about it. Notwithstanding the notice and warning, decedent, although perspiring and suffering with a cold, chose to place his body in a position where he knew it was about to be subjected to a strong draft of cold air. We, therefore, here have the case of an employee who voluntarily exposed himself to abnormal atmospheric conditions. The deplorable results which followed—a chill and death from pneumonia—were the natural, and indeed probable, results of such exposure under the conditions there present.

The line dividing compensable from non-compensable deaths from pneumonia is marked out by the case of Jones v. Phila. & Reading C. & I. Co., 285 Pa. 317, 132 A. 122, on one side and the case of Lacey v. Washburn and Williams Co., 309 Pa. 574, 164 A. 724, on the other. In the former, while the deceased employee and his father were in the course of their employment in a mine the father was buried by the sudden slide of a culm bank. In an effort at rescue, a large quantity of water was used and the son was drenched from his knees down. Pneumonia developed, resulting in his death a few days later. Obviously, the exposure in that case was involuntary; both it and the extensive wetting resulted from the happening of an entirely unexpected, undesigned and fortuitous event—a mishap or accident in every sense of the word. On the other hand, in the case of Lacey v. Washburn and Williams Company, supra, the deceased employee voluntarily "spent about an hour in the refrigerating or 'hardening' room of [an ice cream company] making measurements for carpenter work, where the temperature was from 10 to 20 degrees below zero; he suffered a chill, went home, and developed pneumonia, which caused his death." In the course of its opinion our Supreme Court said:

"The rule deducible from our decisions limits the right to recover compensation to cases where injury or death is due to some unexpected or fortuitous event. From what has been said, we think it can readily be understood that the exposure which caused the death in the instant case was not an accident—as that word is used in our Compensation Act. The chill from which the death resulted, contracted while working for an hour in a refrigerator where the temperature was from 10 to 20 degrees below zero, was not the consequence of a sudden and unexpected event which took place without expectation, a mere chance or contingency. It was not the result of an untoward occurrence, not expected or designed, a mishap or fortuitous happening,

aside from the usual course of events. Quite the contrary, it was a natural and usual consequence of his entering and remaining so long in such a place."

We agree with the conclusion expressed in the opinion written by McNaugher, J., for the court below, in banc, that the case at bar is ruled by Lacey v. Washburn and Williams Company, supra, and we adopt the following excerpt from that opinion: "If [death from pneumonia is not accidental] after an hour is spent inside a refrigerator 10 to 20 degrees below zero, no more is it an accident where a person for the period of a week suffers a cold and partial congestion of the lungs and then chooses, in a perspiring condition, when there is no necessity, to remain inside a small, hot, and confined area covered with soot and dust, while a large, cold-air, draft-fan is turned upon his body. Pneumonia is in such case a natural consequence and not a fortuitous or unexpected happening."

In order to avoid any misunderstanding with respect to the emphasis placed in this case upon the voluntary nature of the exposure, it should be added that a death may be compensable although resulting from certain kinds of voluntary exposure. The test, as stated in Consentino v. Union Paving Company, 113 Pa. Superior Ct. 295, 297, 173 A. 470, (in which death was caused by voluntary exposure to the rays of the sun), is whether death is the natural and probable consequence of the kind of exposure shown to have occurred in a particular case. Each case must be decided upon its own facts.

Judgment affirmed.